Filed 11/30/15  Young Electric Sign Co. v. PC Dixon I CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| YOUNG ELECTRIC SIGN COMPANY,<br><br>Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>PC DIXON I, LLC et al.,<br><br>Defendants, Cross-complainants and Respondents. | C072212<br><br>(Super. Ct. No. 34201000070831CUMCGDS)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed October 28, 2015, in the above cause is modified as follows:

On page 1, delete the first sentence of the opinion and replace with:  In this case, the botched sale of an advertising sign for approximately $20,000 turned into a jury verdict of $832,715 for damages based on lost profits, $3 million in punitive damages, and $369,284 in attorney fees, costs, and expert witness fees.

1

Also on page 1, replace the word "Electronic" in the second sentence with: Electric.

On page 2, change the dollar amount in the second to last sentence of the first full paragraph from $360,000 to $360,642.50.

On page 20, change the dollar amount in the second sentence of the first full paragraph from $186,000 to $180,321.25.

On the same page, change the dollar amounts in the second to last sentence from $90,160.02 to $180,321.25.

On the same page, change the dollar amounts in the last sentence from $90,160.03 to $180,321.25.

On page 21, change the dollar amount in the last sentence of the second full paragraph from $180,321.05 to $360,642.50.

On the same page, change the dollar amount in the first sentence of the last paragraph from $180,321.05 to $360,642.50.

On the same page, delete the second sentence of the last paragraph.

On page 22, delete the last two sentences of the first full paragraph and replace them with: Here, the value of the property is undisputed: $360,642.50. Because PC Dixon -- according to the jury's apportionment of fault in the special verdict -- is 20 percent liable for the conversion, it is entitled to damages of only 80 percent of the value of the EMC, namely $288,514 (i.e., 80 percent of $360,642.50).

On page 23, delete the first sentence of the second full paragraph and replace with: The trial court awarded $290,570 in attorney fees, $21,514.68 in costs, and $57,199.59 in expert witness fees to PC Dixon.

Also on page 23, replace the word "Electronic" in the disposition with: Electric.

And, on page 23, replace the second point in the disposition with: (2) reduce the damages to PC Dixon I, LLC and Pacific Horizon Group, LLC for conversion to 80 percent of the cost of the electronic messaging center, namely $288,514.

This modification does not change the judgment.

The petition for rehearing is denied.


_____/s/_____
BLEASE, Acting P. J.


_____/s/_____
HULL, J.


_____/s/_____
HOCH, J.

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| YOUNG ELECTRIC SIGN COMPANY, | |
| Plaintiff, Cross-defendant and Appellant, | C072212 |
| v. | (Super. Ct. No. 34201000070831CUMCGDS) |
| PC DIXON I, LLC et al., | |
| Defendants, Cross-complainants and Respondents. | |

In this case, the botched sale of an advertising sign for approximately $20,000 turned into a jury verdict of $832,715 for damages based on lost profits, $3 million in punitive damages, and $369,284 in attorney fees and costs.  Built by Young Electronic Sign Company (YESCO), the Gateway Plaza sign stands 75 feet high next to an interstate freeway in Dixon, California, and consists of five stacked advertising panels, commonly

1

called "cabinets."[1] Over the years, YESCO has sustained personnel turnover, engaged in sloppy record keeping, and done a poor job in drafting bills of sale for the Gateway Plaza sign. As a consequence, YESCO attempted to sell 100 percent of the Gateway Plaza sign to PC Dixon I, LLC and Pacific Horizon Group, LLC (collectively PC Dixon) even though YESCO had already sold 20 percent of the same sign to Carl's Jr.[2]

Believing it had purchased the entire sign, PC Dixon removed the Carl's Jr. static advertisement from the top cabinet and replaced it with a more profitable and dynamic electronic messaging center (EMC). When sales at the Carl's Jr. dropped dramatically, the restaurant owner discovered the restaurant's advertisement had been removed from the top cabinet. Carl's Jr. produced an ambiguously worded bill of sale it received from YESCO, and PC Dixon began running the Carl's Jr. advertisement intermittently on the EMC while the parties tried to come to a resolution. The parties failed to reach an agreement, and YESCO repossessed the sign on grounds PC Dixon had paid for only half of the $360,000 EMC. Litigation ensued among YESCO, PC Dixon, and Carl's Jr.[3]

Pertinent to this appeal are the four causes of action alleged by PC Dixon against YESCO for breach of contract, fraudulent concealment, negligent misrepresentation, and conversion. Inexplicably, the jury found YESCO had not breached its contract with PC Dixon even though the trial court instructed it that Carl's Jr. "has the exclusive right

---

[1]    We use "sign" to refer to the entirety of the structure, including supporting pylons, cabinets, and other architectural components.

[2]    Carl's Jr. is a fast-food restaurant chain for which the national franchisor is Carl Karcher Enterprises (often referred to at trial as CKE). The particular Carl's Jr. restaurant that advertised on the Gateway Plaza sign is owned by franchisee STRZ4US. For convenience, we refer to the franchisor, franchisee, and restaurant collectively as Carl's Jr.

[3]    Carl's Jr. is not a party to this appeal.

2

to the top position on the Gateway Plaza sign."[4]  However, the jury found YESCO engaged in fraudulent concealment, negligent misrepresentation, and conversion.  At the urging of PC Dixon's counsel to punish YESCO for its lies about ownership of the sign, the jury awarded $3 million in punitive damages.

On appeal, YESCO contends (1) the evidence does not support a finding of liability for fraudulent concealment, (2) the economic loss rule bars recovery of lost profits for negligent misrepresentation by YESCO, (3) PC Dixon was not entitled to rely on YESCO's stated belief that it could sell the entirety of the sign to PC Dixon, (4) the contract for sale of the EMC from YESCO to PC Dixon expressly precludes recovery of lost profits, (5) insufficient evidence supports the award of lost profits, and (6) the punitive damages award is unsupported by sufficient evidence, violates federal due process guarantees, and is excessive as a matter of California law.

We conclude the fraudulent concealment verdict must be reversed because it was premised on the theory YESCO withheld from PC Dixon the existence of the 2005 bill of sale for 20 percent of the sign to Carl's Jr.  However, the evidence showed YESCO's credit manager read the bill of sale verbatim over the telephone to Chuck Krouse, one of the principals for PC Dixon.  YESCO did not conceal the pertinent information.  Instead, the real problem was that the 2005 bill of sale was so ambiguously worded that no one

---

**4**     The primary dispute among the parties was whether Carl's Jr. owned the top cabinet or only an undivided 20 percent interest in the entirety of the sign and cabinets. On Carl's Jr.'s claim of breach of contract against YESCO, the jury found YESCO had sold a 20 percent interest in the sign and Carl's Jr. had a right to possess the top cabinet. We do not consider the question of how YESCO could have breached the sales contract to Carl's Jr. but not the sales contract to PC Dixon because PC Dixon has not appealed the jury's finding that YESCO did not engage in a breach of contract.  YESCO has also abandoned the argument it presented in the trial court regarding inconsistent special verdicts.  Consequently, the breach of contract cause of action lies beyond the issues on appeal.

understood what exactly had been conveyed to Carl's Jr. until the jury returned its verdict.

We reverse the punitive damages award of $3 million. PC Dixon sought the punitive damages based on the fraudulent concealment "to send a message to YESCO" for failing to tell PC Dixon about the prior sale to Carl's Jr. Because we reverse on the causes of action for fraudulent concealment, the punitive damages are bereft of support.

As with the cause of action for fraudulent concealment, we reverse the jury's verdict for negligent misrepresentation.[5] The negligent misrepresentation claim cannot stand because a YESCO employee read the Carl's Jr. bill of sale verbatim to Krouse. Moreover, Krouse testified he had known about the Carl's Jr. bill of sale for more than two years before PC Dixon purchased the remainder of the sign. And Krouse acknowledged even if he had been aware of the actual language of the bill of sale, it would have made no difference in his decision in purchasing the remaining interest in the sign.

As to the cause of action for conversion of the EMC, we reverse the award of damages because the jury awarded lost profits for this claim. The sales agreement for the EMC expressly precluded lost profits damages. Consequently, PC Dixon is entitled to only the value of the EMC converted by YESCO. That value is reduced by the jury's finding YESCO bore only 80 percent of the fault in conversion of the EMC.

Accordingly, we reverse the judgment and remand with instructions to the trial court to enter a new judgment against YESCO for the cost of the EMC according to the fault apportioned to YESCO by the jury.

---

[5] As we note below, however, the jury's award of damages exactly matches PC Dixon's claim for lost profits arising out of the cause of action for *conversion* of the EMC.

4

## BACKGROUND

### *YESCO Builds the Gateway Plaza Sign*

In 1992, the Gateway Plaza shopping center in Dixon, California, was subdivided into five lots. YESCO constructed the Gateway Plaza sign in 1994, retaining ownership even though the five cabinets were intended to advertise the tenants of the shopping center. The developers of the Gateway Plaza leased the sign from YESCO.

On July 7, 1994, the developers recorded a "declaration of covenants and multi-tenant sign maintenance agreement." The declaration specified each Gateway Plaza tenant would pay 20 percent of the maintenance costs for the sign in exchange for a 20 percent interest in the lease of the sign from YESCO. The declaration further gave each tenant the option to purchase 20 percent of the sign outright.

One of the five tenant lots was divided into two parcels, one of which one was bought in 1996 by Carl's Jr. Chuck Krouse, a local real estate broker specializing in commercial property represented both buyer and seller as a dual broker.

In June 1997, an amendment was recorded to the 1994 declaration of covenants and multi-tenant sign maintenance agreement. Although the amendment was signed only by Carl's Jr. and the owner of the other half of the divided parcel, it purported to give Carl's Jr. a perpetual right to the top position on the Gateway Plaza sign. YESCO was not involved in the execution and recording of the 1994 covenant, subdivision of the parcel, sale of half the parcel to Carl's Jr., or the 1997 amendment to the earlier covenant.

After the 1997 amendment, Carl's Jr. began leasing the top cabinet of the sign from YESCO. Mark Gastineau acted as the salesperson for YESCO. An addendum to the lease included two options: (1) an option for Carl's Jr. to extend the lease for up to five years, and (2) an option to buy 20 percent of the sign "with written approval from all tenant[s] and YESCO." Someone with the surname "Panz" accepted the addendum on behalf of YESCO as assistant division manager/sales. Carl's Jr. promptly installed its advertisement into the top cabinet of the sign.

The Gateway Plaza sign was unique in the YESCO inventory in that the cabinets of a single sign were separately leased to multiple entities.

In June 2002, Carl's Jr. renewed its lease with YESCO for three years. An addendum to the June 2002 lease stated Carl's Jr. "may purchase 20% of the sign" with the further explanation that "[a]ll five of the existing users of the sign can purchase the sign at 20% of the original cost of the sign at the end of the initial 60-month lease period."

### PC Dixon Purchases 50 Percent of the Sign

In 2003, Ronald Caceres, a local real estate developer, formed PC Dixon to purchase the lots that were unsold in the Gateway Plaza shopping center. As part of the purchase of the lots, PC Dixon also assumed the lease of the sign for those lots.

In March 2004, PC Dixon purchased a 50 percent interest in the Gateway Plaza sign from YESCO comprised of: 50 percent of the middle cabinet, 100 percent of the lowest cabinet, 100 percent of the next lowest cabinet, and 50 percent of the sign structure (including rights of access to the sign). PC Dixon paid a total of $10,020.75 for the interest in the sign.

In November 2004, Krouse became half-owner of PC Dixon. Krouse would later transfer his interest in PC Dixon into a newly formed company, Pacific Horizon Group, LLC. Thereafter, PC Dixon and Pacific Horizon Group owned their interest in the sign as tenants in common.

### Carl's Jr. Purchases 20 Percent of the Sign

In March 2005, Carl's Jr. contacted Gastineau at YESCO about purchasing the portion of the sign it had been leasing. In May 2005, YESCO sent to Carl's Jr. a proposal to sell for $6,509 the following: "ONE (1) EACH DOUBLE FACE PYLON SIGN READING 'CARL'S JR.' " Bill Barlow, the Reno Division Manager, signed the bill of sale on behalf of YESCO. Carl's Jr. responded that it accepted "the lease buy out for the

6

Poly Sign contract #5289161." Even though Carl's Jr. purchased the interest, it acknowledged it would continue to pay a $60 monthly maintenance fee to YESCO.

### PC Dixon Purchases the "Other 50 Percent" of the Sign

In July 2005, Gastineau left YESCO and was replaced about a month later by Clint Zufelt.

One day, Zufelt was driving past the sign when he saw another sign company working on the Gateway Plaza sign. Zufelt found out from his supervisor that PC Dixon owned half of the sign. Zufelt testified that "nobody had ever heard" of someone owning half of a sign. Zufelt was instructed to see if PC Dixon "was interested in buying the other 50 percent of the sign." To this end, Zufelt sent Krouse an e-mail stating that "YESCO would be willing to s[ell] you the other 50% for the same price we sold you the original 50% $9,300.00 with a monthly maintenance contract of $165.00." Krouse inquired about the maintenance agreement with Carl's Jr. and was told there was a five-year maintenance agreement with YESCO. Krouse testified Zufelt gave him this information because "he wanted to give me background of what was going to be sold." Krouse asked Zufelt to send the "income numbers" from the Carl's Jr. maintenance fees and "the agreement you have with them." However, Zufelt did not provide the agreement between Carl's Jr. and YESCO.

In August 2007, Zufelt (on behalf of YESCO) and Caceres and Krouse (on behalf of PC Dixon) signed an agreement for "sale of the remaining half of the 75' pylon sign called gateway plaza" for a total of $9,540.25.[6] YESCO gave PC Dixon a bill of sale for

---

[6]    The remaining 50 percent of the sign was intended to be sold for the same amount as the initial 50 percent of the sign to PC Dixon. The difference in the two sales prices arises out of the unexplained decision of YESCO to charge $720.75 in sales tax during the first transaction, but only $240.25 during the second transaction. Also, the record does not shed light on the reason Carl's Jr.'s 20 percent of the sign cost $6,509 -- representing almost twice the valuation of the sign as paid by PC Dixon.

"[O]ne (1) ea, 75' O/A/H[7] double face pylon reading 'Gateway Plaza,' [¶] Structure to accommodate five (5) ea 8' x 12' tenant cabinets, portioned at one fifth of total amount. [¶] . . . [¶] Seller warrants that it is the lawful owner of the Signage, and that it is being transferred to Buyer free and clear of all liens and encumbrances."

### *The EMC*

Krouse may not have known what an EMC was when he entered the agreement to purchase the "remaining 50 percent" of the sign for PC Dixon. However, two days after PC Dixon bought the remainder of the sign, Zufelt began selling the idea of an EMC for the Gateway Plaza sign to generate additional advertising income. An EMC is a computer-controlled, LED-illuminated billboard that displays dynamic advertisements. Krouse considered Zufelt's efforts to be "really bad salesmanship on his part. I thought it was pretty pressuring right away. We just bought the structure a couple days before and he's already promoting me to buy this other thing." Zufelt assured Krouse an EMC would be profitable.

At the time, Dixon city ordinances did not allow EMC billboards. Krouse began efforts to have the city ordinances amended and succeeded in persuading the city council to allow EMC billboards. A conditional use permit modification by the City of Dixon Planning Commission was also necessary for EMC approval. Finally, the approval of CalTrans had to be secured because the Gateway Plaza sign lies adjacent to a California highway. "After a lot of work," Krouse was able to secure CalTrans approval during March 2007. At that point, negotiations over the EMC were still going on between YESCO and PC Dixon.

For more than a year during the permitting process, the Carl's Jr. sign remained in place because PC Dixon did not want to incur the expense of removing it while it was uncertain whether the EMC would be allowed.

---

**7** "O/A/H" refers to overall height of the sign.

8

On August 25, 2008, Krouse sent Zufelt an e-mail to inquire about whether Carl's Jr. had any right to advertise on the sign. Krouse wrote, "PC Dixon/Pacific Horizon . . . bought the Gateway sign on July 31st, 2007, and now you tell me Carl's Jr. lease goes until 6/1/10. The old Lease Rate was $324.35 per month, what are they paying now? When did it start? [¶] These payments should go to the Owner of the sign." (Ellipses in original.) Zufelt quickly responded, "Out of my area, will get back to you." YESCO's credit manager, Rachel Williamson received a copy of the e-mail. Two days later, she responded to Zufelt as follows:

"We have a Carl's Jr Maintenance contract that ends in June 2010, but it's only $60/month. I don't understand what P.C. Dixon has to do with this. Exactly what does he want to know? I can give him a copy of the Carl's Jr contract. Who is the owner of the sign and what does he mean -- payments to the owner of the sign?" That same day, Zufelt responded to Williamson that "P.C. Dixon is the owner of the sign. This is a very long story that starts before you and I were working here. But he does own the sign at this time."

On August 29, 2008, Williamson called Krouse to report Carl's Jr. had a maintenance agreement she would check for what rights Carl's Jr. had to the sign. That same day, Williamson called Michael Wardle, YESCO's corporate secretary and attorney, for advice. She then sent an e-mail to Danny Hunsaker, YESCO's division manager, to inform him: "We have a potential issue with a sign. See attachments -- I called Michael Wardle to get advice. Just want this on your radar. Long story -- I'll fill you in on Monday." The attachments were the 2005 bill of sale to Carl's Jr. and the 2007 bill of sale to PC Dixon.

Also on Friday, August 29, 2008, Williamson sent Krouse the following e-mail: "I have confirmed that we did sell a sign to Carl's Junior in May 2005. There is a slight delay in finding the original bill of sale to verify the sign description. I will update you on Monday." Zufelt, who had been sent a copy of the e-mail, replied: "We sold the sign

9

to [Krouse] not Carl's Jr." Williamson responded only to Zufelt: "That's one of the complications—we have two bills of sales to two different customers for the same sign. That's what [Krouse's] concern was about." No one at YESCO forwarded to Krouse a copy of the bill of sale for the cabinet to Carl's Jr.

Monday, September 1, 2008, was the Labor Day holiday. Either the next day on Tuesday (September 2, 2008) or Wednesday (September 3, 2008), Williamson called Krouse. Krouse took notes of the conversation while he was sitting at his desk. His notes read, "Call with Rachel [Williamson]. Bill of sale. 2005. For cabinet." Krouse testified Williamson "was reading to me off a bill of sale that said cabinet . . . ." Krouse further recounted, "She's a YESCO employee. She would know what YESCO sold. She has it in front of her. I'm on the other end of the line. I'm taking notes from the conversation. I didn't say cabinet. I wrote down the words that Rachel said and Rachel said cabinet and $60 a month maintenance. That's what she said. That's what I wrote." Krouse did not ask for a copy of the bill of sale Williamson read to him. As a result of the telephone conversation, it was Krouse's "understanding of this bill of sale . . . that it conveyed the Carl's Jr. sign cabinet to Carl's Jr. care of Strz4us." Even so, Krouse decided not to do anything with respect to the sign until the permitting for the EMC was completed. Krouse also did not contact anyone at Carl's Jr. about their rights to the sign.

On September 5, 2008, Williamson sent an e-mail to Hunsaker and Zufelt in which she reported: "I spoke to Chuck Krouse (Pacific Horizon) on Wednesday and he was not concerned with the Bill[s] of Sales. However, he did mention that he had other bills of sales that show ownership of the cabinets. This may come up later—these were not in the files I found. For now he asked that we just wait to make sure the permit was approved for the new pylon sign before proceeding in any direction. I'm fine with that!"

In January 2009, Krouse reported to Zufelt that he was successful in securing approval for the EMC. Zufelt forwarded the e-mail to Hunsaker on the same day he received it from Krouse. The Carl's Jr. sign would soon be removed.

10

### *Conflict Arises*

The EMC was in place and turned on in July 2009. In August 2009, the paid advertisements displayed on the EMC did not include Carl's Jr. As soon as Carl's Jr. was no longer advertised on the Gateway Plaza sign, business at the restaurant dropped by 20 percent. A district manager for Carl's Jr. went to the vicinity and discovered its advertisement had been removed from the Gateway Plaza sign. Soon thereafter, Colleen Ford-McDonough -- Carl's Jr.'s real estate management vice president -- called Bill Buttrum at YESCO. Ford-McDonough found the "first phone call was not successful because [YESCO] did not have the documents we had." Buttrum indicated "that they had had a flood and they did not have all of their documents." Ford-McDonough sent Buttrum the documents and "after reading our document he said, yes, you do own a portion of the sign and YESCO has made a mistake and we want to make it right."

On August 19, 2009, there was a "[t]ense and uncomfortable" meeting of representatives from YESCO, PC Dixon, and Carl's Jr. The meeting did not result in any resolution. The next day, Ford-McDonough e-mailed the 2005 bill of sale and maintenance agreement to Krouse. It was the first time Krouse saw the bill of sale. Krouse did not think the bill of sale showed Carl's Jr. purchased an interest in the sign.

Also during trial, Krouse reviewed a copy of the 2005 bill of sale to Carl's Jr. He testified the bill of sale shown to him mirrored what Williamson had read him over the phone on September 2 or 3, 2008. Moreover, Krouse testified he knew about the sale to Carl's Jr. because "[t]hat understanding came from Rachel [Williamson], yes."

### *Jury Verdict*

The jury returned a special verdict in which it found YESCO had not breached its contract with PC Dixon, but was liable for fraudulent concealment, negligent misrepresentation, and conversion. For the three torts, the jury awarded to PC Dixon

damages in the amount of $832,715.[8]  For the fraudulent concealment, the jury awarded

PC Dixon punitive damages of $3 million.  The trial court entered judgment, including

prejudgment interest, in the amount of $3,887,636.39.

YESCO moved for a new trial on grounds that included excessive damages.  The

trial court denied the motion.  The trial court subsequently awarded PC Dixon $290,570

in attorney fees and $78,714 in costs.

YESCO timely filed a notice of appeal.

### DISCUSSION

### I

### *Evidence Regarding Fraudulent Concealment by YESCO*

YESCO contends the verdict for fraudulent concealment is not supported by the

evidence presented at trial.  The contention has merit.

### A.

### *YESCO Read to Krouse the Bill of Sale to Carl's Jr. before PC Dixon Bought the EMC*

PC Dixon's theory of the case for the cause of action based on fraudulent

concealment depended on YESCO's intentional concealment of the bill of sale to

Carl's Jr.  Thus, PC Dixon's attorney argued to the jury that fraudulent concealment was

proven because Krouse, on behalf of PC Dixon, bought the EMC before learning

20 percent of the sign had been sold to Carl's Jr.  Counsel for PC Dixon addressed the

jury as follows:

"You've got to send these two bills of sale to [Krouse].  And equally important

don't you think, ladies and gentlemen, you send them to your customer, to Carl's Jr.?  Let

Carl's Jr. know, hey, we might have a mistake here.  It's not a mistake.  This is

intentional.  This is exactly what they were doing.  Not being honest.  *Not disclosing the*

---

[8]     This amount is the same as the amount of lost profits calculated by PC Dixon's
expert as a result of the EMC being taken down.

*information that they knew that my client didn't know* and that Carl's Jr. didn't know.  [¶] Instead, [Williamson] later that day [September 2, 2008] sends the bills of sale to [Zufelt].  You remember I asked [Zufelt] how easy would it have been, . . . to just forward this e-mail *and this whole things stops*.  Nobody buys an EMC, though, and that's what stops that.  YESCO doesn't want to stop because this is a great deal, a very good deal for YESCO.  [¶]  Ladies and gentlemen, that's the essence of my fraudulent concealment claim, okay.  If you have information about the sale [to Carl's Jr.], you got to give it to your customer."  (Italics added.)

Based on the same theory of the case, PC Dixon's counsel further argued to the jury:  "Point here, ladies and gentlemen, my clients actually rely upon YESCO's failure to disclose this information and they relied on it to their detriment because this information was not disclosed.  My clients went forward with the 2009 [EMC] contract, which they . . . would not have entered into at all, we all know that."

In its special verdict, the jury found that "YESCO intentionally fail[ed] to disclose an important fact that PC Dixon/Pacific Horizon did not know and could not reasonably have discovered."

**B.**

***Fraudulent Concealment***

Fraudulent concealment involves "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."  (Civ. Code, § 1710, subd. (3).)  " '[T]he elements of a cause of action for fraud based on concealment are:  " '(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he [or she] did if he [or she] had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression

13

of the fact, the plaintiff must have sustained damage. [Citation.]' [Citation.]"
[Citation.]' (*Kaldenbach v. Mutual of Omaha Life Ins. Co*. (2009) 178 Cal.App.4th 830,
850 (*Kaldenbach* ); accord *Levine v. Blue Shield of California* (2010) 189 Cal.App.4th
1117, 1126–1127.)" (*Bank of America Corp. v. Superior Court* (2011) 198 Cal.App.4th
862, 870-871.)

## C.

### *Concealment and Reliance*

The jury's finding of fraudulent concealment must be reversed. The verdict runs
contrary to Krouse's testimony that YESCO's credit manager read to him over the
telephone contents of the 2005 bill of sale to Carl's Jr. Thus, Krouse -- acting on behalf
of PC Dixon -- had all the information about the 2005 bill of sale that YESCO had.
YESCO's disclosure of the actual wording of the 2005 bill of sale was confirmed by
Krouse's contemporaneous notes of this conversation with Williams and by his
testimony. Because PC Dixon's fraudulent concealment theory of the case was premised
on nondisclosure of the 2005 bill of sale, we reverse based on YESCO's reading the
language of the bill of sale, verbatim, to PC Dixon. As ambiguous and confusing as the
bill of sale's language may have been, it was not concealed.

Moreover, PC Dixon did not prove it would have acted differently even if
Williams had presented the 2005 bill of sale to Krouse in written form. At the time,
Krouse did not think the 2005 bill of sale, 1994 declaration, or 1997 amendment had any
effect "whatsoever." During trial, PC Dixon asked Krouse about the bill of sale's
description of what had been sold as follows:

"Q. If you had seen that description back in 2008, combined with the information
you had been given from YESCO, would that have led you to believe that there was any
issue at all regarding ownership of the sign structure?

"A. [Krouse] No. Because it's a pylon sign reading Carl's Jr."

14

Krouse further testified he would "[a]bsolutely not" have believed there was any issue relating to ownership of the sign even if he had seen the maintenance agreement between Carl's Jr. and YESCO.

YESCO's disclosure of the bill of sale did not trigger any reaction from Krouse because it was so ambiguously worded Krouse did not appreciate that it involved the sale of part of the Gateway Plaza sign to Carl's Jr. In 2008, the reality of the situation was that there was considerable doubt regarding the meaning of the bill of sale to Carl's Jr. Indeed, PC Dixon acknowledges the 2005 bill of sale to Carl's Jr. was "ambiguous and confusing." Indeed, the issue of what was actually conveyed in the 2005 bill of sale was not settled until this case was tried. PC Dixon's counsel argued Carl's Jr. could have acquired "only one thing, ladies and gentlemen, the cabinet." However, the trial court found Carl's Jr. acquired "an undivided 20 % ownership interest in the Gateway Plaza Sign . . . ." In short, Krouse made a mistake in interpreting the bill of sale -- a mistake not unique to him. Thus, in addition to lack of proof of concealment, PC Dixon also failed to show concealment would have made a difference to PC Dixon.

In defending the judgment, PC Dixon does not deny Williams read the bill of sale verbatim to Krouse. Instead, PC Dixon adopts a new theory of the case by arguing that "[i]t is not 'the contents of the 2005 bill of sale' which are at issue here." Under PC Dixon's new argument, "[w]hat should have been disclosed was the fact that Carl's Jr. *had* (*or might even have had*) the right to advertise on the sign by virtue of a question about ownership, which would necessarily mean Carl's Jr. had not relinquished its recorded right to advertise at the top of the sign."

We reject the contention for two reasons. First, PC Dixon argued to the jury it was the withholding of the 2005 bill of sale that satisfied the claim of fraudulent concealment. Thus, the claim succeeds or fails on this fact. Second, the discussion between Williams and Krouse was exactly about whether Carl's Jr. had a right to advertise on the Gateway Plaza sign. PC Dixon's subsequent difficulties with the EMC arose not from

15

concealment of the bill of sale, but misinterpretation of the significance of the bill of sale. In short, this was a case of mistake rather than hidden facts.

Accordingly, we reverse the verdict on the cause of action for fraudulent concealment.

## II

### *Punitive Damages*

YESCO argues the $3 million punitive damages awarded by the jury are unwarranted and excessive. Because the punitive damages award is entirely dependent on the fraudulent concealment claim, our conclusion that YESCO did not engage in fraudulent concealment also compels the conclusion the punitive damages award must be reversed.

The jury found that "YESCO's conduct was malicious, fraudulent or oppressive" on the basis that YESCO's fraudulent concealment was "a substantial factor in causing harm to PC Dixon/Pacific Horizon." The jury's finding credited the argument made by PC Dixon's trial attorney, who argued YESCO should be penalized for withholding vital information from PC Dixon. Thus, the $3 million punitive damage award was based on PC Dixon's fraudulent concealment claim.

As we explained in part I, *ante*, YESCO did not fraudulently conceal the bill of sale for 20 percent of the sign to Carl's Jr. YESCO's credit manager read the bill of sale verbatim to PC Dixon's principal. Because YESCO did not engage in malice, fraud, or oppression in withholding vital information, the punitive damages award is unsupported and must be reversed.

## III

### *PC Dixon's Negligent Misrepresentation Cause of Action*

In its opening brief, YESCO argues the economic loss rule bars PC Dixon from recovering lost profits for its negligent misrepresentation cause of action when relief for such disappointment is limited to contract remedies. Upon review of the record, we

16

asked the parties to file supplemental briefs addressing, among other issues, the question of whether the jury was precluded from finding YESCO engaged in negligent misrepresentation (1) after YESCO's credit manager read the bill of sale to Carl's Jr. over the telephone to Krouse, and (2) in light of Krouse's admission he would not have acted any differently even if he had known about the Carl's Jr. bill of sale prior to PC Dixon's purchase of the remainder of the Gateway Plaza sign. Having received and considered briefing on the issue from YESCO and PC Dixon, we conclude the cause of action for negligent misrepresentation must be reversed.

## A.

### *Negligent Misrepresentation*

" 'Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit. "Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he [or she] may be liable for negligent misrepresentation, a form of deceit." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 720 at p. 819; see also [Civ. Code,] § 1572, subd. 2 ["[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he [or she] believes it to be true"]; [Civ. Code,] § 1710, subd. 2 ["[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true"].)' (*Bily v. Arthur Young & Co.* [(1992)] 3 Cal.4th [370,] 407-408.)" (*Friedman v. Merck & Co.* (2003) 107 Cal.App.4th 454, 475-476.)

To establish a cause of action for negligent misrepresentation, a plaintiff must prove that " ' "1. The defendant must have made a representation as to a past or existing material fact[;] [¶] 2. The representation must have been untrue; [¶] 3. Regardless of his [or her] actual belief the defendant must have made the representation without any reasonable ground for believing it to be true; [¶] 4. The representation must have been made with the intent to induce plaintiff to rely upon it; [¶] 5. The plaintiff must have been unaware of the falsity of the representation; *he [or she] must have acted in reliance*

17

*upon the truth of the representation and he* [*or she*] *must have been justified in relying upon the representation.* [¶] 6. And, finally, as a result of his [or her] reliance upon the truth of the representation, the plaintiff must have sustained damage." ' " (*Friedman v. Merck & Co.*, *supra*, 107 Cal.App.4th at p. 476, quoting *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 402, italics added.)

**B.**

***PC Dixon's Claim for Negligent Misrepresentation***

PC Dixon's negligent misrepresentation claim was presented to the jury, which found YESCO had made "a false representation of an important fact" regarding the Gateway Plaza sign without having reasonable grounds for the representation. PC Dixon's claim was based on "YESCO's failure to draft accurate contracts, keep accurate records, and act pursuant to such records and contracts . . . ." In short, the negligent misrepresentation cause of action focused on YESCO's sale of part of the sign it did not own.

Krouse acknowledged he knew Carl's Jr. "owned the cabinet" in April 2003 -- four years before PC Dixon signed an agreement for the remainder of the sign. At trial, YESCO's counsel questioned Krouse about Krouse's contemporaneous notes as follows:

"Q. And do you see the indication where [Gastineau] told you that Carl's Jr. owns its cabinet?

"A. I see that now, yes.

"Q. [Y]ou see it?

"A. I can see it now. I agree with you. That's what it says.

"Q. Okay. And so we know that by April 8 of 2003 you knew that Carl's Jr. owned its cabinet, right?

"A. That is correct.

"Q. Because Mark Gastineau told you that, right?

"A. That is correct."

18

And as we recounted in part I C., *ante,* Krouse acknowledged he had all the information about the 2005 bill of sale YESCO had because Williamson read him the document verbatim over the telephone.

Krouse's testimony undermined PC Dixon's negligent misrepresentation claim because "[t]o prevail on a cause of action for negligent misrepresentation, the [plaintiff] must show that the [defendant] misrepresented to the [plaintiff] a past or existing material fact without reasonable grounds for believing it was true. And the [defendant] must have intended to induce the [plaintiff's] reliance on the misrepresentation, with the [plaintiff] ignorant of the truth and damaged by justifiable but erroneous reliance on the misrepresentation." (*Rios v. Scottsdale Ins. Co*. (2004) 119 Cal.App.4th 1020, 1028.) Krouse's testimony defeated PC Dixon's claim it was ignorant of the truth regarding Carl's Jr.'s ownership of at least the top cabinet in the sign.

Moreover, PC Dixon did not establish actual reliance on any misrepresentation by YESCO regarding ownership of the sign. As we noted in part I C., *ante*, Krouse did not believe the 2005 bill of sale, 1994 declaration, or 1997 amendment had any effect "whatsoever." Thus, PC Dixon did not actually rely on any misrepresentation when purchasing the remainder of the sign in 2007. Actual reliance, however, is an essential element of a cause of action for negligent misrepresentation. (*Friedman v. Merck & Co*., *supra*, 107 Cal.App.4th at p. 476.)

PC Dixon contends the bill of sale to Carl's Jr. was so ambiguous that reading it to Krouse did not negate YESCO's misrepresentation. According to PC Dixon, YESCO's credit manager essentially said, "There is nothing to worry about." We disagree. Williamson made no such statement. Instead, she read the actual language of the bill of sale to a sophisticated commercial real estate broker who already had prior knowledge Carl's Jr. had purchased an interest in the sign -- at least for the top cabinet in the sign. Krouse came to his own conclusion about the meaning of the bill of sale to Carl's Jr. He

19

was not misled by Williamson.  Consequently, the negligent misrepresentation cause of action must be reversed.[9]

## IV

### *Lost Profits for Conversion of the EMC*

In contrast to our earlier review of the bills of sale for the Gateway Plaza sign to Carl's Jr. and PC Dixon, this issue concerns the later contract in which YESCO sold the EMC (for placement onto the Gateway Plaza sign) to PC Dixon.  The jury found YESCO liable for conversion in the repossession of the EMC after PC Dixon refused to make the $186,000 payment for the unpaid half of the EMC.  For this cause of action, the jury awarded lost profits of $832,715 to PC Dixon.  YESCO challenges the jury's award on grounds the contract for the sale of the EMC prohibits recovery of lost profits.  The contention is meritorious.

### A.

### *Contract for Sale of the EMC from YESCO to PC Dixon*

PC Dixon sought lost profits based on its accounting expert's calculation the EMC would have resulted in a net gain of $832,715 over the course of 15 years of advertising on the Gateway Plaza sign.  YESCO countered by introducing the contract for the sale of the EMC, with emphasis on paragraph 12K of the contract.  Paragraph 12K provides: "Seller [YESCO] shall not be liable for incidental or consequential damages, *including lost profits*, irrespective of cause or theory."  (Italics added.)  PC Dixon paid only the first installment of $90,160.02 on the EMC.  After the dispute over the Gateway Plaza sign arose, PC Dixon refused to make the second payment of $90,160.03.

---

[9]     Our conclusion obviates the need to consider YESCO's alternate claims that (1) the economic loss rule bars recovery of lost profit damages for the negligent misrepresentation cause of action, and (2) even if PC Dixon is entitled to lost profits for negligent misrepresentation, the jury erred in awarding damages based on the anticipated profits from the EMC.

The trial court instructed the jury that "Paragraph 12K of the contract for the purchase and sale of the EMC provides YESCO shall not be liable for incidental or consequential damages, including lost profits, irrespective of cause or theory. [¶] PC Dixon and Pacific Horizon are making no claim for such damages in relation to that contract. That's the contract for the purchase and sale of the EMC." However, in the special verdict the jury awarded $836,715 in part based on finding YESCO liable for conversion of the EMC. On the claim of conversion, the jury apportioned 80 percent of fault to YESCO, 10 percent to PC Dixon, and 10 percent to Pacific Horizon.

## B.

### *Contractual Limitation on Damages*

"Generally, 'a limitation of liability clause is intended to protect the wrongdoer defendant from unlimited liability.' (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 503, pp. 552–554.) Clauses of this type 'have long been recognized as valid in California.' (*Markborough California, Inc. v. Superior Court* (1991) 227 Cal.App.3d 705, 714.) With respect to claims for breach of contract, limitation of liability clauses are enforceable unless they are unconscionable, that is, the improper result of unequal bargaining power or contrary to public policy. (*Id.* at p. 714.)" (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1127.) Here, the parties do not dispute that paragraph 12K of the EMC contract is valid under California law. Consequently, we conclude the jury erred in awarding $832,715 in lost profits for conversion of the $180,320.05 EMC.

We observe YESCO challenges only the measure of damages *as lost profits* -- not the validity of the conversion finding or the $180,320.05 cost of the EMC. Indeed, in arguing against the conversion finding providing support for the punitive damages award, YESCO appears to have no objection "if the Court were to hold that PC Dixon is entitled to recover the $180,000" for conversion of the EMC. We also observe PC Dixon claims it "never sought lost profits arising out of the conversion of their [EMC]." We accept

21

PC Dixon's statement as a concession that the measure of damages for the EMC cannot be its lost profits.

As to the proper measure of damages for conversion, this court has previously observed that, "[a]s a general rule, the value of the converted property is the appropriate measure of damages, and resort to the alternative occurs only where a determination of damages on the basis of value would be manifestly unjust." (*Lueter v. State of California* (2002) 94 Cal.App.4th 1285, 1302.) Here, the value of the property is undisputed: $180,320.05. Because PC Dixon -- according to the jury's apportionment of fault in the special verdict -- is 20 percent liable for the conversion, it is entitled to damages of only 80 percent of the value of the EMC, namely $144,256.04.[10]

Despite the certainty of the damages for conversion, we reverse with directions to reduce the award, rather than modify of the judgment on appeal, in order to allow PC Dixon to move for a new trial on the ground of inadequate damages. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 753.) The California Supreme Court has explained the appropriateness of this disposition as follows: "Where an appellate court vacates judgment for plaintiff with directions to enter a new judgment in a greater amount, the defendant may move for a new trial after entry of the new judgment. [Citations.] Where the appellate court directs entry of judgment in an amount less than the original judgment, the same rule obviously applies. The plaintiff should be given an opportunity to move for a new trial after entry of the new judgment. In both situations, a party who may have been satisfied with the original judgment may in reliance upon it refrain from seeking a new trial or appealing or may have had his [or her] motion for new trial denied on the ground that the original judgment was sufficiently favorable to him [or her]. The judgment directed by the

---

[10] The parties do not challenge the apportionment of fault by the jury on the claim of conversion. Consequently, we do not review the validity of the apportionment.

22

appellate court is less favorable to him [or her], and he [or she] should be permitted to determine whether to seek a new trial and to have a motion for new trial considered in the light of the new judgment." (*Woodcock v. Fontana Scaffolding & Equipment Co*. (1968) 69 Cal.2d 452, 459-460.) Accordingly, we reverse and remand consistent with the Supreme Court's guidance.

## V

### *Attorney Fees and Costs*

Finally, YESCO asserts reversal of the judgment also requires reversal of the attorney fees and costs awarded on the judgment. We agree.

The trial court awarded $290,570 in attorney fees and $78,714 in costs to PC Dixon. The trial court awarded the *contractual* attorney fees for bringing *tort* causes of action on the rationale that the representation on breach of contract claims overlapped with the "issues and evidence used to pursue the tort claims." Given our conclusion that two of the three tort claims must be reversed and the measure of damages for the remaining tort claim substantially reduced, the award of attorney fees and costs for advancing those claims must also be reversed and remanded to the trial court. (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 371; *Beard v. Goodrich* (2003) 110 Cal.App.4th 1031, 1036.)

## DISPOSITION

The judgment is reversed and the matter remanded with instructions for the trial court to (1) eliminate the award of damages for fraudulent concealment and negligent misrepresentation, (2) reduce the damages to PC Dixon I, LLC and Pacific Horizon Group, LLC for conversion to 80 percent of the cost of the electronic messaging center, (3) reconsider the award of attorney fees and costs to PC Dixon I, LLC and Pacific Horizon Group, LLC to reflect this new judgment, (4) award Young Electronic Sign Company its costs on appeal (Cal. Rules of Court, rule 8.278(a)(1) & (2)), and (5) hear

23

any motion for new trial based on excessive or inadequate damages awarded in the new judgment.

       /s/
HOCH, J.

We concur:

       /s/
BLEASE, Acting P. J.

       /s/
HULL, J.